

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

SEP 0 6 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
              DEPUTY CLERK

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of: | ) |
| | ) |
| The residence located at 15482 Cascade Loop, | ) |
| Nevada City, California, as further described in | ) |
| Attachment A-1. | ) |
| | ) |

Case No.   **2:17-SW--792   CKD**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**See ATTACHMENT A-1, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

**See ATTACHMENT B, attached hereto and incorporated by reference.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| | *Code Section* | *Offense Description* |
|---|---|---|
| 1) | 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to Distribute and to Possess w/ Intent to Distribute Controlled Substances |
| 2) | 21 U.S.C. § 841(a)(1) | Distribution and Possession w/ Intent to Distribute Controlled Substances |
| 3) | 21 U.S.C. § 843(b) | Use of the U.S. Mail to Facilitate a Drug-Trafficking Offense |

The application is based on these facts:

**See Affidavit of U.S. Postal Inspector Jason P. Bauwens, attached hereto and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of __30__ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jason P. Bauwens, U.S. Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    September 5, 2017

_____
*Judge's signature*

City and state:    Sacramento, California

Hon. Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Jason P. Bauwens, Postal Inspector with the U.S. Postal Inspection Service, first being duly sworn, declare and state as follows:

### Background and Experience

1.      I am a Postal Inspector with the U.S. Postal Inspection Service (USPIS).  I am currently assigned to the Sacramento, California, office.  My responsibilities include investigating criminal violations of federal and state law, including illegal narcotics and narcotics proceeds being sent through the U.S. Mail; money laundering; robbery and burglary of postal facilities; destruction of government property; theft/possession of stolen U.S. Mail; mail and bank fraud; and identity theft crimes.

2.      I have been employed as a federal law enforcement agent for over 15 years, during which I have graduated from several federal training academies.  In 1998, I graduated from the National Park Service Law Enforcement Academy in Sylva, North Carolina, which was a 10-week police academy.  In 2003, I graduated from the National Park Ranger Integrated Police Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, which was a 16-week police academy.  Most recently, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, which was a 12-week training program.  Throughout my career, I have investigated over 1,000 cases involving criminal violations of federal, state, and tribal laws.  I have instructed hundreds of hours of training related to the detection, identification, and investigation of narcotics trafficking.  I have testified as a witness in various federal and state court proceedings.  I have participated in multiple Title III wire intercepts regarding narcotics trafficking investigations and have worked with numerous confidential sources.

3.      Through my training, experience, and interaction with other experienced Postal Inspectors, Task Force Officers, and other drug-trafficking investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs; to collect and conceal drug-related proceeds; and to communicate with other participants to accomplish such objectives.  I have received specialized training and instruction in narcotics investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, and drug identification.  I have participated in and led numerous investigations targeting individuals and organizations trafficking marijuana, methamphetamine, heroin, cocaine and other controlled substances and narcotics proceeds. During the course of these investigations, I have become familiar with the manner in which drug traffickers conduct their illegal operations.  I have written numerous search warrants related to drug trafficking investigations, drug proceeds investigations, and drug parcel interdiction.

4.      I am a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.

5.      Unless stated otherwise, I have personal knowledge of all of the matters set forth in this affidavit.  To the extent any information in this affidavit is not within my personal knowledge, it was made known to me through my own review of the documents discussed in this affidavit and through reliable law enforcement sources, including discussions with other law enforcement officers assigned to this case.  The conclusions and opinions set forth below are based on my experience and training as a U.S. Postal Inspector, and conversations I had with other law enforcement officers who are familiar with the facts and circumstances of this investigation.  Because this affidavit is being submitted for the limited purpose of securing three separate search warrants, I have not included each and every fact known to me concerning this investigation.  I have only set forth those facts that I believe are necessary and appropriate to establish probable cause for the search warrants requested herein.

**<u>Scope of Requested Search Warrant</u>**

6.      This Affidavit is being submitted in support of a warrant to search the following:

      a.      The residence located at **15482 Cascade Loop, Nevada City, California** ("the TARGET LOCATION"), as further described in Attachment A-1.

      b.      The person of **Daniel TORRES** (DOB: 7/10/1983), provided that he is located in the Eastern District of California at the time this search warrant is executed.  (*See* Attachment A-2.)

7.      The TARGET LOCATION is located in the Eastern District of California, and is further described in Attachment A-1.  At the time this warrant is executed, I believe that target subject Daniel TORRES will also be located in the Eastern District of California.

8.      Based on the facts set forth below, I believe that Daniel TORRES is a principal co-conspirator, along with others, in a drug-trafficking organization, through which controlled substances—and marijuana specifically—are manufactured in the Eastern District of California, and then shipped out of state (to Tennessee and Virginia, particularly) via the U.S. Mails.  I also believe that TORRES, and others, are using their respective cellular phones to facilitate their drug-trafficking activities.  This affidavit therefore requests authority to search the locations described in Attachments A-1 and A-2 to locate and seize the items described in Attachment B as evidence and instrumentalities of the following crimes:

-      21 U.S.C. § 841(a)(1) – Distribution of, and Possessing with Intent to Distribute Controlled Substances.

-      21 U.S.C. § 843(b) – Unlawful Use of the U.S. Mails in Furtherance of Narcotics Trafficking.

-      21 U.S.C. § 846 – Attempt or Conspiracy to Distribute, or to Possess with Intent to Distribute Controlled Substances.

**Background of Investigation**

9.      In 2016, the U.S. Postal Inspection Service began investigating an interstate Drug Trafficking Organization (referred to hereafter as the "Cherry/Larson DTO") operating in and around the areas of Grass Valley and Nevada City, California.  Investigators have since determined that the Cherry/Larson DTO has been involved with the cultivation and interstate distribution of hundreds of pounds of marijuana since at least 2015.  During this investigation, law enforcement has interdicted or seized dozens of parcels suspected of containing marijuana, which have originated from the Nevada County area, and which were shipped outside the state of California.

10.      In September 2016, Postal Inspectors noticed that a large number of Priority and Express Mail parcels, which originated in Tennessee and Virginia and were consistent with containing narcotics proceeds, were being received at multiple addresses in Grass Valley and Nevada City, California.  The addresses were linked to Jade LARSON, one of the targets of the ongoing investigation.  On October 18, 2016, Postal Inspectors in Tennessee intercepted a parcel destined for one of the Grass Valley, California, addresses linked to LARSON.  Following a positive alert on the parcel by a drug detection dog, a federal search warrant for the parcel was obtained and executed and $15,000 in U.S. currency was seized from the parcel.

11.      In December 2016, law enforcement received a tip from a source of information (SOI) stating that Jade LARSON was involved with an interstate marijuana shipping operation.  The SOI stated that LARSON was involved with a male named Jeff CHERRY, who cultivates marijuana in the Grass Valley area and then distributes the harvested marijuana to LARSON, who in turn, mails it to Johnson City, Tennessee, to a man named James HALEY.  Following the shipment of marijuana, the SOI stated that LARSON receives lots of parcels in the U.S. Mail from Tennessee, which contain large amounts of cash.  The SOI stated that the cash in the parcels are the proceeds from the sold/shipped marijuana.  The SOI was aware of at least one specific USPS parcel that LARSON received in the mail from Tennessee that contained a large amount of U.S. currency.  The SOI advised the tracking number on the parcel that contained the currency was #EK595880575US.  The SOI stated that the parcels from Tennessee that contain cash typically have a false name listed as the recipient, often the last name "Moner".  The SOI further stated that LARSON mentioned on one occasion that she was expecting a parcel in the mail with approximately $15,000 in it but it never showed up.  The SOI stated that when LARSON tracked the package online, she saw that it had never left Tennessee.  The SOI advised that LARSON has been referred to as "mama weed" locally.  The SOI also advised that LARSON receives the money parcels at various addresses, but she actually lives at 10682 Alta Sierra Drive, Grass Valley, California.  The SOI stated that CHERRY had previously been growing marijuana at 15609 and 15611 Del Mar Way in Penn Valley, California, but was unsure if there was a marijuana growing operation currently at either location.  The SOI stated that LARSON used to live with a man named Joseph YANEZ, who is also involved with LARSON cultivating and distributing large quantities of marijuana.  The SOI stated that in the past, LARSON would store marijuana at YANEZ's residence, which is located at 10978 Garden Lane, Rough and Ready, California.

3

12.     After receiving the tip, Postal Inspectors tried to verify information provided by the SOI. A check of the CLEAR database confirmed that LARSON is associated with the addresses provided by the SOI, as well as other addresses suspected of receiving parcels containing drug proceeds.  An additional check of CLEAR confirmed that YANEZ is currently living at the address provided by the SOI.  Postal Inspectors conducted a search of the tracking number provided by the SOI and confirmed that a parcel originated from Johnson City, Tennessee, and was delivered to 10193 Dalewood Way, Grass Valley, California (an address connected to LARSON), on January 27, 2016, as described by the SOI.  Postal Inspectors conducted a review of the information on the parcel that was seized on October 19, 2016, in Tennessee that contained $15,000, and observed the parcel was addressed to a person with the last name "Monier", similar to what was reported by the SOI.  Postal Inspectors identified a male in the Johnson City, Tennessee, area named James HALEY.  During a search of addresses associated with HALEY during 2016, dozens of parcels were delivered to his associated addresses which originated in the greater Nevada County, California, area, which were consistent with marijuana shipments.  During a search of the addresses associated with LARSON during that same period, dozens of parcels that originated from Tennessee and Virginia cities were also delivered to her addresses; these parcels were consistent with narcotics proceeds shipments.

13.     On March 3, 2017, Postal Inspectors intercepted a parcel that was mailed from Johnson City, Tennessee, and was destined for **Daniel TORRES at 15482 Cascade Loop Nevada City, California 95959** (the TARGET LOCATION).  Following a positive alert on the parcel by a drug detection dog, Postal Inspectors obtained and executed a federal search warrant on the parcel.  It was found to contain $18,800 in U.S. currency wrapped in multiple layers of vacuum sealed plastic.

14.     On March 7, 2017, Postal Inspectors identified a parcel that was mailed from Monroe, Virginia, and was destined to the Alta Sierra address, the residence of LARSON.  Following a positive alert on the parcel by a drug detection dog, on March 8, 2017, Postal Inspectors obtained and executed a federal search warrant on the parcel, which was found to contain $17,060 in U.S. currency, wrapped in vacuum sealed plastic, which was concealed within a Beats Headphone box.  The currency was placed back in the parcel and was re-sealed.  On March 9, 2017, Postal Inspectors conducted a controlled delivery of the parcel and observed that it was taken into the residence of LARSON.

15.     On March 14, 2017, Postal Inspectors conducted surveillance of LARSON and observed her arrive at a Bank of America ATM in Grass Valley, California.  YANEZ arrived at the bank and met with LARSON at the ATM.  Following the ATM transaction, YANEZ and LARSON left in separate directions driving separate vehicles.  A short time later, YANEZ and LARSON were both observed parked at the Alta Sierra residence.  After the vehicles departed the residence, law enforcement noted LARSON visited the Hometown Hydroponics store in Grass Valley, California, which is where TORRES is employed.  Additionally, past and present co-owners of Hometown Hydroponics have a history of marijuana cultivation and money laundering activities.  Shortly after departing the Hometown Hydroponics store, LARSON was observed meeting in a parking lot with a male driving a gray Dodge Pickup (CA LP #7D93937), which is

4

registered to TORRES.  Following this meeting with TORRES, LARSON was seen departing the area, following TORRES in his truck.  Law enforcement later conducted a check of bank records and determined several thousand dollars in cash was deposited into LARSON's account on this date.

16.     On March 30, 2017, a target of this investigation living in Tennessee mailed a suspected money parcel from the Johnson City, Tennessee Post Office, again destined for Daniel TORRES at the TARGET LOCATION.  On April 3, 2017, Postal Inspectors conducted a controlled delivery of the parcel at the apparently vacant address located at the TARGET LOCATION, which has received previous narcotics proceeds parcels throughout this investigation.  During the surveillance of the residence, LARSON was observed arriving at the residence driving YANEZ's vehicle, and retrieving the suspected money parcel from the porch of the residence.  At the time of the delivery, two vehicles were observed parked at the residence, both of which were registered to Daniel TORRES.

17.     On April 25, 2017, law enforcement reviewed surveillance video located at Nevada City and Grass Valley, California, main post offices.  Specifically, video was reviewed covering the mailing of three parcels suspected of containing narcotics that were mailed to various Virginia addresses on March 17, March 25, and April 18, 2017.  The three parcels all weighed over 15 pounds and were consistent in size, weight, and appearance to other parcels that have been shipped to numerous Tennessee and Virginia addresses throughout this investigation.  During a review of all three mailings, the person observed on the surveillance video mailing each of the parcels was YANEZ.

18.     On May 17, 2017, a suspected money parcel was mailed from a co-conspirator in this investigation in Johnson City, Tennessee, destined for the TARGET LOCATION.  On May 18, 2017, Postal Inspectors exposed the parcel to a narcotics detection dog, who positively alerted to the parcel.  The parcel was delivered to the TARGET LOCATION and shortly thereafter, the electronic tracking device on YANEZ's vehicle showed that shortly after the parcel was delivered, YANEZ's vehicle drove in close proximity to the TARGET LOCATION and then immediately left the area.  The geolocation data for YANEZ's vehicle showed that after it went to the delivery address, it drove to LARSON's residence.

19.     On May 19, 2017, Postal Inspectors intercepted a parcel mailed from the Grass Valley, California, Post Office, which was destined to a known target address in this investigation, located in Jonesborough, Tennessee.  On May 20, 2017, Postal Inspectors exposed that parcel to a narcotics detection dog, who positively alerted to the parcel.  On May 22, 2017, Postal Inspectors executed a federal search warrant on the parcel.  As a result, over 10 pounds of marijuana was seized from the parcel.  Law enforcement conducted a review of the post office video surveillance at the time the parcel was mailed and positively identified YANEZ as the person who mailed the parcel.  A review of geolocation data and surveillance by law enforcement showed YANEZ'S vehicle went to the Hometown Hydroponics store (where Daniel TORRES works) and then to LARSON's residence, immediately before mailing the later seized parcel.

5

20.     In March 2017 and again in July 2017, law enforcement conducted a review of phone toll records for LARSON'S known telephone numbers.  During the review, it was determined that the phone number registered to LARSON had continued calls with phones registered/linked to TORRES, YANEZ and CHERRY.

21.     In April 2016 and July 2017, two separate suspects in Virginia were arrested for receiving marijuana shipped through the U.S. Mail.  Following their arrests, lawful data extractions were conducted of their phones.  During the extractions, law enforcement identified numerous phone numbers registered to or linked to LARSON on the phones.  Additionally, during analysis of the SMS and/or text messages on the phones, the phone numbers registered/linked to LARSON regularly exchanged messages with the arrested suspects discussing strains of marijuana, prices of marijuana, USPS tracking numbers, shipping names and addresses in Virginia and California, bank account numbers and amounts of deposits for LARSON's and YANEZ's accounts, and inquiries about if packages made their destinations or not.

22.     USPS records show that between October 2016 and August 2017, the TARGET LOCATION received approximately 20 parcels from Tennessee and Virginia, that are consistent with other parcels containing cash that were previously seized and observed in this investigation.

23.     On August 31, 2017, law enforcement executed federal search warrants, which were issued by this court, at the residences of LARSON, YANEZ, and CHERRY.  Between the three residences, law enforcement seized marijuana plants under cultivation, pounds of processed and packaged marijuana for sale, scales, bulk currency and observed a large quantity of supplies used in the packaging, shipping and distributing of marijuana.  During a preliminary examination of cell phones seized at LARSON'S residence, phone calls and text message evidence was observed between LARSON and TORRES.  In addition, while searching LARSON's residence, agents found a USPS parcel box that had previously been shipped from Virginia and was addressed to Daniel TORRES at the TARGET LOCATION.  The parcel appeared similar to other parcels observed during this investigation.  During post-*Miranda* statements from both LARSON and YANEZ, both stated they had purchased/received pound quantities of marijuana from TORRES in the past.  LARSON advised that YANEZ and herself often received cash parcels in the mail, and used the cash to purchase additional marijuana from TORRES.  LARSON advised YANEZ and herself would often drive to the TARGET LOCATION to pick up parcels containing U.S. currency that were delivered by the USPS.  LARSON advised that she personally observed large quantities of processed marijuana at the TARGET LOCATION in the last month.  Additionally, she advised that TORRES had told her that he has large quantities of bulk U.S. currency hidden in various places around the TARGET LOCATION.

24.     On September 1, law enforcement conducted surveillance at the TARGET LOCATION. Law enforcement observed the same two vehicles parked at the residence, which were observed in March and are registered to TORRES, as well as the gray Dodge pickup observed meeting with LARSON in March, which is also registered to TORRES.  A check of the CLEAR database

on this same date, a proprietary public records database utilized by law enforcement, showed that a person named Daniel TORRES is associated with the TARGET LOCATION.

25.      I am aware based on my training and experience, that persons involved with marijuana cultivation, marijuana trafficking, and the trafficking of marijuana proceeds through the U.S. Mail, often maintain numerous residences for the sole purpose of cultivating, storing, maintaining, packaging and receiving shipments which contain narcotics and narcotics proceeds. I am aware based on my training and experience that persons involved with marijuana cultivation, marijuana trafficking and trafficking  of marijuana proceeds will utilize their vehicle(s) to buy, sell, transport, mail and distribute contraband related to drug trafficking, as well as further facilitate their ongoing drug trafficking conspiracy.

26.      Based on the facts set forth above, I believe Daniel TORRES and others are involved in the large-scale distribution and sales of marijuana in/out of the Eastern District of California. I also believe that the vehicles utilized by Daniel TORRES are being used to facilitate marijuana trafficking operations and to transport marijuana and marijuana.

### Training and Experience Regarding Drug Trafficking and Drug Traffickers

27.      As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control.  It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live.   United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).   It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991).

28.      Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them.  Typically, drug traffickers keep records of those registrations and transactions in their residence.

29.      I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of

drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

30.     In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

31.     In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, marijuana, which they intend to distribute. It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

32.     In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

33.     In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

34.     In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution. During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

35.     In addition, drug traffickers often tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" proceeds derived from the distribution of controlled substances.

36.     In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

37.     Individuals involved in the distribution of marijuana often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their narcotics distribution, use, possession, or any other activities surrounding their drug-trafficking activities, and that such items often identify co-conspirators in their drug-trafficking activities.

38.     It has been my experience in the past, and particularly in this case, that when suspects use mobile phones to communicate with cooperating individuals or undercover agents to set up their drugs deals, records relating to these activities will be found stored in the cellular telephone.

39.     I know that drug traffickers use mobile phones to communicate with one another, either by voice or text message. Mobile phones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the phone numbers of other drug traffickers and the dates and times that they and/or the mobile phone user dialed one another's telephones. Mobile phones also contain in their memory a telephone book. This allows the user to store phone numbers and other contact information; the information stored in a phone used by a drug trafficker is evidence of the associations of the drug trafficker, some of which are related to his or her illegal business. Mobile phones also contain in their memory text messages sent, received, and drafted by the mobile user. The text message history of a narcotics trafficker's mobile phone can contain evidence of drug trafficking because it shows the communications or planned communications of a drug trafficker and the phone numbers of those with whom the drug trafficker communicated or intended to communicate. Mobile phones also have a voicemail function that allows callers to leave messages when the user does not answer. Drug traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile phones can also contain other user-entered data files such as to-do lists, which can provide evidence of crime when used by a drug trafficker. Mobile phones can also contain photographic data files, which can be evidence of criminal activity when the user was a drug trafficker who took pictures of evidence of crime. Mobile phone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile phones.

40.     As described above and in Attachments A-1 and A-2, this Affidavit seeks permission to search and seize things that are related to the drug-trafficking conspiracy between TORRES, and his co-conspirators, in whatever form such things are stored. Based on my training and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

41.    It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances, including marijuana, as well as the proceeds from such illegal operations.

42.    The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation.  This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

43.    Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in Attachment B.  Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all the items listed in Attachment B to this Affidavit and incorporated here by reference.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

10

## Conclusion

44.     The facts set forth in this affidavit demonstrate probable cause to believe that Daniel TORRES and others are involved in the above-described offenses, and that evidence, fruits, and instrumentalities of these offenses, as described in Attachment B, are likely to be found at the locations listed in Attachment A-1, and on the person of Daniel TORRES.

45.     Accordingly, I respectfully request authority to search:

   a.     The residence located at **15482 Cascade Loop, Nevada City, California** ("the TARGET LOCATION"), as further described in Attachment A-1.

   b.     The person of **Daniel TORRES** (DOB: 7/10/1983), provided that he is located in the Eastern District of California at the time this search warrant is executed. (*See* Attachment A-2.)

       I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

                                                Jason P. Bauwens
                                                United States Postal Inspector

Sworn and subscribed to me on September 5, 2017

Hon. Carolyn K. Delaney
United States Magistrate Judge

Approved as to form:

Timothy H. Delgado
Assistant United States Attorney

11

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

In the Matter of the Search of:

The residence located at 15482 Cascade Loop, Nevada
City, California, as further described in Attachment A-1.

Case No.  **2:17-SW--792    CKD**

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ EASTERN _____ District of _____ CALIFORNIA _____
*(identify the person or describe the property to be searched and give its location)*:

**See ATTACHMENT A-1, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**See ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ September 19, 2017 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken
to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where
the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern
District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for  30  days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    9/5/2017  1:21 pm    _____
                                              *Judge's signature*

City and state:      Sacramento, California      Hon. Carolyn K. Delaney, U.S. Magistrate Judge
                                                 *Printed name and title*



**Attachment A-1**
**Places to be Searched**

A.      **TARGET LOCATION** – The residence located at **15482 Cascade Loop, Nevada City, California**. The residence is located in the northwest corner of the intersection with Cascade Loop and Gaston Drive. The residence is further described as a two story, single family, wooden "A-Frame" style construction. The residence is yellow with dark brown trim and a brown shingle roof. The front door of the residence faces west. The numbers "15482" can clearly be seen on the residence from the roadway of Cascade Loop. The house has a raised, wooden deck that wraps around the residence. Research indicates that it is a 1,480 square foot residence on 1/2 acre lot. Approximately 30 yards from the residence, is a matching outbuilding, also yellow in color with brown trip and a brown roof.



B.      The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises. The place to be searched also includes all vehicles over which the owner, occupant, or resident of the aforementioned premises has dominion and control, as determined by the agents at the time of the execution of the search warrant by agent's observation of such persons operating or accessing the vehicle; DMV records show ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person found at the residence.

**Attachment A-2**
**Places to be Searched**

A.      The person of Daniel TORRES (DOB: 7/10/1983), provided that he is located in the Eastern District of California at the time this search warrant is executed.

B.      The search of Daniel TORRES is to include all bags, backpacks, notes, receipts, computers, digital devices, and digital media located on his person or under his control, where the items specified in Attachment B may be found.

13

**Attachment B**
**Items to be Seized**

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Daniel TORRES and his co-conspirators:

- 21 U.S.C. § 841(a)(1) – Distribution of, and Possessing with Intent to Distribute Controlled Substances.

- 21 U.S.C. § 843(b) – Unlawful Use of the U.S. Mails in Furtherance of Narcotics Trafficking.

- 21 U.S.C. § 846 – Attempt or Conspiracy to Distribute, or to Possess with Intent to Distribute Controlled Substances.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including marijuana, or items frequently used to distribute marijuana; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

3. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone

14

numbers, communications, and illegal activities of associates in drug trafficking activities;

7.    Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.    Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.    Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.   Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

11.   All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with TORRES during execution of the warrant.  This authority to search such mobile telephones includes the following within each mobile telephone:

    A.    Call history (incoming, outgoing, missed);
    B.    Text messaging history (incoming, outgoing, drafts);
    C.    Contacts list;
    D.    Data screen or file identifying the telephone number associated with the mobile telephone searched;
    E.    Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;
    F.    Voicemail;
    G.    User-entered messages (such as to-do lists);
    H.    Photographs; and
    I.    Any passwords used to access the electronic data described above.

# # #